DELIO ALUM TORRES ET AL., Plaintiffs and Appellees, *v.* RAFAEL CAMPOS DEL TORO ET AL., Defendants and Appellants.

No. 12917.      Decided October 23, 1963.

*Francisco M. Susoni* and *Pablo Defendini* for appellants. *Antonio Reyes Delgado* for appellees.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

This is an appeal taken on May 14, 1958, from a judgment sustaining a complaint claiming the value of personal property and damages. Appellees filed their brief on April 15, 1963.

The trial on the merits was held on March 26, 27 and 28, 1956 and September 3, 4 and 5, 1957. Extensive oral and documentary evidence was heard. The transcript of the oral evidence exceeds 600 pages.

As far as the time available has permitted us, we have made a detailed review, analysis and study of the different pieces which form the record on review. It disclosed the con-

currence of circumstances, facts and events in the case which, fortunately, very rarely occur within ordinary judicial proceedings prosecuted before our courts.

In his accurate, clear and appropriate findings and conclusions, the trial judge made a statement of the case which in its pertinent part reads as follows:

"After the case was submitted plaintiffs filed a motion for leave to amend the title of the action and the prayer of the complaint. Defendants have not objected, and in our opinion the pleadings and the evidence so warrant. *Muñoz* v. *Pardo,* 68 P.R.R. 569 (1948), and *Fernández* v. *Heirs of Fernández,* 66 P.R.R. 831 (1947). We therefore admitted them, and hereafter this action will be entitled 'Collection of the Value of Property Illegally Appropriated'; and instead of requesting the revendication of the properties, the action is considered as aimed at recovering the value of the latter with legal interest thereon as of the date of the appropriation. 31 L.P.R.A. § 3518, and 32 L.P.R.A. § 1064; *Moskovitz* v. *Le Francois,* 8 P.2d 1050 (Cal. 1932) ; and *Nelson* v. *Kunz,* 115 A.L.R. 1322 (Utah 1938).

"The complaint, as amended, states only two claims: the first for $23,645.67, alleged value of the properties illegally appropriated, plus legal interest on this sum as of the day defendants appropriated them to themselves, and the second for $15,000 for damages caused by an unlawful eviction. The facts alleged in support of these remedies may be summed up as follows:

"The first cause of action states that: (1) Rafael Campos del Toro and his wife Rosaura Márquez are owners of a five-story building in Arecibo, of which they rented three and one half floors for $750 a month to Delio Alum and his wife Antonia Serrano, who installed therein their dwelling, a beauty parlor and a hotel; (2) all the furniture, equipment and fixtures thereof were the exclusive property of plaintiffs; they were worth $23,645.67 on September 17, 1952, and some of them were encumbered in favor of the Banco de Ponce for $2,788.92, others to Ismael Hernández for $537.19, and others to North Electric Co. for $368, which credits were assigned to defendants; (3) at this time plaintiffs owed $2,837 in back rent; the Campos Márquez spouses sued them for collection thereof, and also claimed

$5,000 for damages to the building; (4) after furnishing bond, the Arecibo Part of the Superior Court ordered the attachment of the furniture, equipment and fixtures; the marshal attached them closing the premises where they were kept and evicted plaintiff and his guests; (5) Alum and his wife did not answer the complaint, their default was entered, and judgment was rendered against them for the amount of the unpaid rent and $3,000 for damages; before the judgment became final and unappealable, execution thereof was requested and ordered; the auction was held after defendants had already rented the furniture and the premises to a third person, and they adjudicated the property to themselves; (6) the Alum Serrano spouses sought the nullity of the attachment and of the judicial sale; the court set them aside; no appeal was taken from said order and, this notwithstanding, (7) defendants have not returned the attached property, have sold some of them, and others have disappeared.

"The second cause of action considers reproduced the facts summed up above, and alleges that: (1) at the request of defendants, plaintiffs were ejected from the premises occupied by them in the building of the former without judgment of eviction having been rendered against them; and (2) they have suffered physical and moral damages for $15,000.

"It is prayed that defendants be ordered to pay $23,645.67 for the personal property which they appropriated to themselves plus legal interest on the sum claimed as of September 17, 1952, and $15,000 for the damages caused by the wrongful eviction. Plaintiffs agree therein that certain credits to which defendants are entitled be deducted, and request $5,000 for costs, expenses and attorney's fees.

"The answer to the amended complaint, and by the admissions of defendants, accepts many of the facts comprised in the preceding summary. They allege, however, (1) that at the time of the attachment plaintiffs were not occupying the leased premises and were not the owners of the properties purchased from North Electric Co.; (2) that they agreed in writing that any judgment which might be entered against them for rent due, would be sufficient authority to evict them within 30 days; and (3) that defendants do not own the properties which they adjudicated to themselves; that they were not worth $23,645.67, and that plaintiffs have not suffered damages."

The court specified as follows the facts which it found proved in each cause of action:

*"Findings of Fact.—First Cause of Action:*

"1. Rafael Campos and his wife Rosaura Márquez are the owners of a five-story building in Arecibo of which they leased to plaintiffs in December 1948 three and one half floors for a monthly rent of $750, where the Alum Serrano spouses established their dwelling, a beauty parlor and a hotel. Hereafter we shall refer to the latter as 'the premises.'

"2. The furniture, the equipment and the fixtures of the latter, including the electric installations, medicine cabinets and all dependencies, and a bar, a platform and a balustrade in the dancing and dining room—which we shall continue to call 'the furniture'—were purchased and installed by plaintiffs. The electrical fixtures were fixed to ceilings and walls, but were removable; the medicine cabinets were so installed in holes in the walls that they could be removed without damage to the building, and the latter three were fixed to the floor of the room.

"3. Plaintiffs owed part of the purchase price of practically all the furniture and, among others, those purchased from Ismael Hernández and North Electric Co. were mortgaged in favor of the vendors. Furthermore, a great number of them were mortgaged in favor of the Banco de Ponce, Arecibo Branch, and to secure loan to the Alum Serrano spouses.

"4. On September 17, 1952 plaintiffs owed to the Campos Márquez spouses $2,837 in back rent. In order to collect it, plus $5,000 for damages allegedly caused to the premises, defendants herein brought action CD-52-901, *Campos del Toro et al.* v. *Delio Alum et al.,* in the Arecibo Part of this Court, for collection of money and damages; they requested and were granted effectiveness of judgment; they gave the bond fixed by the court and the same was approved; a writ of attachment was issued, and plaintiffs in that action pointed out to the marshal 'as property of defendants to be attached the following: the entire equipment of the hotel, which includes the furniture, showcases, merchandise, cupboards, refrigerators, counters, stoves, and fixtures thereof, and the bar, lamps, rugs and cash on hand.'

"5. In compliance with the writ issued in the action for collection of rent, the marshal, at the request and under the

direction of Campos del Toro, proceeded to attach, and did attach, the hotel and also the beauty parlor and the dwelling; ejected Alum and his guests; closed the premises; did not allow Serrano de Alum to go inside; and handed the key to Gumersindo Román.

"6. In the record of civil case CD-52-901 there is no order of the court designating or ratifying the designation of Gumersindo Román, bailee of the attached properties.

"7. The marshal made an inventory of most of the furniture, equipment and fixtures which he seized and attached, but he did not inventory all the properties of plaintiffs which he attached and delivered to Campos. The furniture inventoried by the marshal is that described and specified in defendants' Exh. 23.

"8. The following pieces of property which were in the premises at the time of the attachment and which were attached as well as the others do not appear in the inventory:

"2 plush rugs
1 'Toñita's Beauty Parlor' neon sign
1 'Hotel Alum' neon sign
1 glass and ceramic block bar
2 'All purpose' chairs of the beauty parlor
4 washbowls
1 12-drawer kardex
38 medicine cabinets with mirror doors
34 lamps over medicine cabinets
2 3 x 3 mirrors in the bar
1 mahogany lathe balustrade balcony
3 fluorescent lamps 4 x 40
12 fluorescent lamps 4 x 20
29 fluorescent lamps (chrome) 4 x 20
5 fluorescent lamps (chrome)
1 wood and ceramic orchestra platform
5 pillows with their pillow cases
12 mosquito nets
12 bedspreads
38 sheets
31 blankets
62 towels
24 tablecloths

"There is no question that those uninventoried chattels were in the premises and were attached. Marshal Marengo testified that he did not inventory the lamps and the medicine cabinets because they were fixed to the ceilings and walls. The lamps, bar, and rugs were included in the list of properties—Exhibit 1(e), and in the return of the writ of attachment—Exhibit 1(f) —it is said that they were attached; the auction edict—Exhibit 1(o)—includes '43 four-tube fluorescent lamps of different sizes' and '1 fluorescent sign Toñita's Beauty Parlor'; and in their answer defendants expressly admit 'the third allegation of the first cause of action of the amended complaint,' subds. (a) and (b) of which specify, as fixtures and furniture of the hotel, of the beauty parlor and of plaintiffs' dwelling, all the electric installations and medicine cabinets. In the course of the testimony of defendants' witness, Ismael Hernández, a list was offered and admitted in evidence—defendants' Exh. 3—showing as chattels which were in the hotel on the occasion of his visit 'a TS neon sign, 34 lamps over medicine cabinets, 2 mirrors in the bar, 3 fluorescent lamps, 12 lamps, 29 chrome lamps, 5 fluorescent lamps, 2 beauty parlor chairs, 19 tablecloths.'

"The aforesaid documents, the admissions of defendants, and evidence introduced by them show that chattels which do not appear in the inventory were actually in the premises and were attached. And we conclude that the uninventoried chattels claimed by plaintiffs were there. Moreover, it is admitted that 31 beds were attached. The marshal testified that he inventoried only the linen which was on the beds because he did not look in the closets. Plaintiff testified that she had one bedspread, one blanket, one mosquito net, two sheets and two pillows with their pillow cases for each bed; that she never had less than two towels for each room and two tablecloths for each dining room table. Twelve of these appear in the inventory. Witness Candita Rexach corroborates these points of plaintiff's testimony, and witness Alvarez testified that he verified the existence of the uninventoried bed linen, of the 'Hotel Alum' sign, the bar, the washbowls, the kardex, the balustrade, the platform and the rugs.

"9. On September 17, 1952 plaintiffs still owed (1) $2,788.92 to the Banco de Ponce, (2) $536.19 to Ismael Hernández, balance of the purchase price of some furniture, (3) $386 to Philco Puerto Rico, Inc.

"10. These credits enjoyed preference, and after the furniture, equipment and fixtures which secured payment thereof were attached, the defendants purchased them: that of Banco de Ponce on October 20, 1952, for $2,370.59; that of Ismael Hernández on October 29 of the same year, for $500; and that of Philco Puerto Rico, Inc. on April 2, 1953, for $200.

"11. From the time defendants acquired these credits until April 15 of this year, interest has accrued thereon at the rate of 6 percent annually, as specified below:

"Banco de Ponce—5 years, 5 months, 25 days        $918.145
"Ismael Hernández—5 years, 5 months, 16 days        175.685
"Philco P.R., Inc.—5 years, 13 days        116.35

"12. The chattels which plaintiffs purchased from North Electric Co. under a conditional sales contract belonged to plaintiffs at the time the attachment was levied. The conditional vendor never assigned them to defendants nor to any other person; on December 1, 1952 North Electric Co. only assigned to César Garcés and the latter to James Payne and the latter, subsequently, to defendants, the right to repossess the chattels for nonperformance of the conditional sales contract. None of them has repossessed them.

"13. The chattels attached, namely, those comprised in findings 7 and 8 above, were purchased between 1948 and 1952. On the evidence offered we conclude that their reasonable value at the time of attachment was $16,000.

"14. On October 23, 1953 Superior Judge Ramón A. Cancio, acting in the Arecibo Part, annulled the attachment whereby defendants took possession of the chattels on September 17, 1952, as well as the auction sale whereby they appear adjudicating them to themselves on January 13, 1953. Notice of this order was served on defendants and they did not appeal; therefore, it is final and unappealable.

"15. By December 30, 1952, the day prior to the auction sale, defendants had already sold the Seeborg juke box which had been attached and had leased to James Payne the premises with all of plaintiffs' chattels. Therefore, independently of the declaration of nullity, we conclude, as a matter of fact, that the auction held January 13, 1953 was, at least in part, more apparent than real.

"16. Plaintiffs have not yet satisfied the judgment for $2,837 rendered on November 14, 1952 in the action for collection of

rent. Up to April 15, 1958 a daily interest of $0.4728, at the rate of 6 percent annually, has accrued on this sum, aggregating $922.59 for 5 years, 5 months and 1 day. An appeal has been taken from the judgment ordering plaintiffs to pay the sum of $3,000 for damages. This court does not know whether the appeal has been decided. Up to April 15 of this year, that is, 5 years, 5 months, and 1 day, interest thereon at 6 percent annually, $0.50 a day, nets $975.50.

"17. In order to secure these sums and interest thereon totalling $7,735.09 up to April 15 of this year, defendants attached property worth $16,000.

"18. Defendants defended themselves against the motion to set aside the auction sale; they were timely served with notice of the order adverse to them; they did not appeal, yet they did not return the chattels to plaintiffs, and on March 1, 1954, knowing that those chattels did not belong to them, they sold them to César Garcés.

"19. They do not have the chattels which they appropriated to themselves.

*"Second Cause of Action:*

"1. On September 17, 1952, Delio Alum resided in the dwelling which defendants had leased to him and was operating the hotel. His wife did not live there, she had a separate residence in Río Piedras and was not ejected. The marshal ejected Delio Alum from his dwelling by instructions of defendants.

"2. When plaintiff Alum was ejected from his dwelling no court had entered any judgment or order decreeing his ejectment. Nor was there any unlawful detainer action against him. Plaintiffs have never agreed that any judgment which might be rendered against them in an action for collection of unpaid rent should operate as an order to evict them. The agreement signed by them on January 29, 1949 bears no relation nor refers to the action for collection of rent.

"3. As a result of that ejectment plaintiff Alum has suffered physically and morally and was deprived of the conveniences of the home. These damages are assessed at one thousand dollars ($1,000).

"It is correct that plaintiffs ought to make reasonable efforts to reduce the damages suffered, but plaintiffs had no income other than that from the hotel business, and when it was at-

tached they were left practically without means for their support. Under the circumstances appearing from the evidence as a whole, we do not believe that we ought to deprive plaintiffs of their rights because of their failure to exercise due diligence.

"Plaintiffs' lack of diligence would have some importance if they had insisted on their third cause of action; however, it should not militate against their rights to collect the value of the chattels, nor should it affect the action of plaintiff Alum to recover damages caused to him by the wrongful ejectment. After he was ejected from his dwelling, he could not do anything to limit the effects of the humiliation and annoyances caused to him and could not prevent the loss of the comforts of the home from which he was wrongfully ejected." . .

█ In its conclusions of law the court decided against defendants the legal question raised by them to the effect that the action of damages suffered by the wrongful attachment did not lie in our jurisdiction where the action in which it was decreed had been decided in favor of the attacher. It also formulated separate conclusions of law on the two causes of action. It made a liquidation of the crossclaims of the parties declaring them offset up to a certain limit. It rendered judgment ordering the defendant spouses to pay the total amount of $9,703.31 and $1,200 for attorney's fees.

In their brief defendants-appellants maintain that the trial court committed the following errors:

*"Assignment of Errors*

*"First Error.* The Superior Court, San Juan Part, erred in denying the motion to dismiss the complaint for lack of cause of action.

*"Second Error.* The Superior Court, Arecibo Part, erred in admitting evidence on, and considering facts relative to, the attachment and judicial sale carried out in the action for collection of lease rental and damages caused to the leased property other than those which served as basis for the declaration of nullity in that case.

"*Third Error*. The Superior Court, San Juan Part, erred in granting as remedy the return of the chattels attached and auctioned by virtue of the effectiveness and execution of the judgment, respectively, in the action for collection of lease rental and damages caused to the leased property, or else the market value of the chattels at the time of attachment.

"*Fourth Error*. The Superior Court, San Juan Part, erred in considering and holding that plaintiffs were evicted and ejected from the leased premises, and in awarding damages for the alleged eviction or ejectment.

"*Fifth Error*. The Superior Court, San Juan Part, erred in failing to recognize and consider defendants' legal duty to prevent or minimize the damages through the legal remedies available therefor.

"*Sixth Error*. The Superior Court, San Juan Part, committed manifest error in the weighing of the evidence.

"*Seventh Error*. The Superior Court, San Juan Part, erred in rendering judgment sustaining the complaint, such judgment being contrary to law."

In our opinion, the trial court decided the litigation correctly and, consequently, it did not commit the errors assigned. Let us see.

# I

Defendants-appellants contend, first, that it erred in denying the motion for dismissal. They allege that "both in Puerto Rico and on the American continent, in all jurisdictions . . . an action of damages caused by a wrongful attachment lies only when in the litigation in which the attachment was executed defendant has obtained judgment in his favor as to plaintiff's claim."

On this point the trial court was of the following opinion:

"Defendants' written briefs raise two questions of law and one special defense.

"1. By the first they maintain that in our jurisdiction an action for damages caused by wrongful attachment does not lie when the action decreeing the same has been decided for

the attacher. They cite *Sorrentini & Cía.* v. *Méndez,* 76 P.R.R. 646.

"The concurring circumstances in the case *supra* and in the case under consideration are not the same. Although in both the complaint granting the effectiveness was sustained, in *Sorrentini* the defendant in his answer counterclaimed for recovery of damages resulting from the attachment of his property which he alleged was illegally levied since the complaint did not lie, but he did not question the validity of the attachment per se except as to the fact that it accrued from an action which was unfair or without cause. We do not say that a void attachment, by itself and independently of the result of the main action, always gives rise to an action for damages. But the fact is that the origin of this cause of action is not the same as that passed upon in that case. Originally, this case was ˉaimed at revendicating the possession of plaintiffs' personal property— 32 L.P.R.A. §§ 1111 and 1461—of which defendants took possession through void attachment and auction, the nullity of which had been judicially declared and accepted by defendants. In its present state this cause of action is not revendicatory, but neither is it of damages. Instead of seeking the return of the properties together with the value of their use, request is made for payment of their value with legal interest as of the day they were appropriated, because in their answer defendants denied having them and evidence was presented at the trial to show that they have sold some of them, others have disappeared and others have deteriorated considerably.

"In this situation § 230[1] of the Code of Civil Procedure, in connection with 31 L.P.R.A. §§ 3025, 3081 and 3084(3), is necessarily applicable."

■ The court acted correctly in refusing to apply to the case the doctrine of *Martí* v. *Hernández,* 57 P.R.R. 804

---

[1] The text of this section in its pertinent part reads as follows:

"In an action to recover the possession of personal property, judgment for the plaintiff may be for the possession or the value thereof, in case a delivery cannot be had, and damages for the detention. If the property has been delivered to the plaintiff, and the defendant claim a return thereof, judgment for the defendant may be for a return of the property, or the value thereof, in case a return cannot be had."

(1940); *Sosa* v. *Heirs of Morales*, 58 P.R.R. 362 (1941), and *Sorrentini & Cía.* v. *Méndez*, 76 P.R.R. 646 (1954). In the light of the facts and concurring circumstances, it was not necessary for the Alum Serrano spouses to obtain favorable judgment in the original action brought against them by pharmacist Campos del Toro. By the judgment rendered against them in the original action he was not rendered immune from liability for the consequences of the unlawful, wrongful, deceitful and abusive action which he performed against them, with full consciousness, availing himself of the remedies of a judicial proceeding.

His first action, through his employees Lilí Porrata and Gumersindo Román, whom he designated to instruct the marshal and to help him carry out the attachment on September 17 and 18, 1952, notwithstanding the fact that the officer was acting on the authority of a writ to attach "all the property . . . sufficient to cover the sum of $7,834 . . . claimed in the complaint," consisted in evicting defendant spouses from the apartment of the building where they lived and from the hotel, restaurant, beauty parlor, dance terrace, and from the other places of the building where they carried on business; in ejecting from the hotel business the guests and employees and preventing them from returning thereto, and attaching property the reasonable value of which was estimated by the trial judge at $16,000. By public deed the lease was made for five years and expired on December 1, 1953 (plaintiffs' Exh. 10).

His second action: to lease and deliver, without court authorization or the consent of the Alum Serrano spouses, lessees and defendants at that time—see plaintiffs' Exhs. 10 and 11 and defendants' Exh. 5—in the middle of December 1952 all the premises of the building from which they had been ejected in the manner stated, and further, all the personal property and goods attached.

His third action: having sold on December 30, 1952, a Seeborg juke box, which had been attached, without a court order or defendants' permission.

His fourth action: having caused an auction sale to be held on January 13, 1953, in execution of the judgment, of defendants' property without such default judgment being final or enforceable and after having rented the attached properties, and adjudicating to himself at that auction for $1,000 chattels worth $16,000.

His fifth action: neither he nor the bailee of the chattels attached in September 1952 delivered, in whole or in part, the said chattels, notwithstanding the order of October 23, 1953, dissolving the attachment and the auction. On this point the trial court held: ". . . evidence was offered at the trial to show that they—Campos del Toro and his wife— have sold some, others have disappeared and others have deteriorated considerably." When the second action was finally decided in April 1958, the chattels were not in possession of the judicial bailee nor of Campos del Toro.

His sixth action: selling for the price of $10,000 to César Garcés, by document drawn up by a notary on March 1, 1954 —five months after voiding the auction—all the chattels attached in September 1952, and, as stated by respondent court, ". . . knowing that those chattels did not belong to them."[2]

---

[2] A "controversy . . . involving the lease rental for the premises occupied in Edificio Campos" existed between Campos del Toro and Alum. The original rental of $1,500 was reduced to $750 in January 1949 pending decision of reasonable rental by the Rent Administrator. Plaintiffs' Exh. 1.

In his testimony as a witness for plaintiffs, Campos del Toro testified in part:

"Q. When did you go inside the hotel after the attachment?

A. Some time later I asked the judge for permission to prepare the building, etc., and he gave me permission.

Q. The furniture which was attached there, where is it?

A. It is there.

Q. Who has it?

Campos del Toro had a clear right to claim through ordinary judicial channels payment of the lease rental due and unpaid and the damages unlawfully caused to his property, and to avail himself in the action of ancillary legal measures to secure the effectiveness of the judgment which

A. César Garcés has it.

Q. How come he has it? In capacity of what?

A. In capacity of nothing. I have left it there without collecting one penny.

Q. Didn't you sell the furniture to him?

A. Yes, sir, I tried to sell it to him, but he has not paid anything.

Q. The question is whether or not you sold the furniture to him?

A. I have not sold it to him because he has not paid me. I offered to sell it to him.

Q. Did you execute a deed or contract before Esteban Susoni selling the furniture to him?

A. Susoni made that contract to sell it to him, but he has not paid for the furniture.

Hon. Judge:

Q. But, was the contract signed?

A. Yes, sir.

Q. For the sale of the furniture?

A. Yes, sir, it was signed.

Q. Hasn't the contract been rescinded or dissolved afterwards?

A. The contract was never registered; it was a deed and it was made in the law office of Susoni. Yes, it is practically void because the other party has not paid.

Q. Did you notify Garcés that the contract is ineffective because of his nonperformance?

A. Yes, sir.

Q. In writing?

A. No, sir, personally.

Plaintiff:

Q. For how much did you sell the furniture to Garcés?

A. For $10,000, everything which was there.

Q. To whom did you deliver that furniture before delivering it to Garcés, if it had been delivered to some other person?

A. Payne had leased that furniture.

Q. When was the lease contract made with Payne?

A. It was a verbal contract. It was never carried out.

Q. When did you lease that furniture to Payne?

A. Some time in January 1953 or 1954; in January 1953 or 1954 . . . 53 . . .

Q. What day of January?

A. Late in January.

Q. Do you recall the date Payne inaugurated the Hotel Kin Jim?

might be rendered at the proper time. However, he did not have the slightest right to perform the specific actions which we have enumerated.

These are not ordinary cases in which a complaint is dismissed after attaching defendant's chattels and causing him prejudice, or in which bondsmen are held liable on the basis of the bond given by them in order to authorize the attachment. It is more serious in law. It is the deprivation of personal and private rights without the due process of law. The indirect evictions, the destruction of several businesses, and the appropriation and private sale to a third person of all chattels of defendants therein, were unlawful actions performed during the pendency of the proceeding. Actually, the attachment procedure served as an excuse to eject defendants therein from their dwelling and hotel, deprive them of the lease, and give them to James L. Payne, plaintiff herein, taking justice in his own hands.

■ Attachment is a juridical interdiction in the debtor's patrimony, decreed at ex parte request of the claimant creditor. One of its procedural effects is to subject or submit the attached goods to the performance of the obligation or claim in the main action, that is, to secure the effectiveness of the judgment rendered in the case if the action exercised should prosper. As a cautionary or ensuring measure, its life or efficacy depends on the action brought.

---

A. I do not recall.

Q. Do you know whether Hotel Kin Jim was the former Hotel Alum?

A. It was the same.

Q. When you rented the furniture to Payne, didn't you at any time take out a single piece of furniture of those which belonged to Alum?

A. None."

In that deed of purchase and sale subscribed by Campos del Toro and his wife, the latter set forth that they were "owners of the chattels described below," and they described the property attached to Alum commencing with "Neon Hotel Sign." Plaintiffs' Exh. 21.

On January 29, 1960, we rendered judgment in appeal 12,523 affirming the default judgment entered on November 14, 1952.

The Act of 1902 to secure the effectiveness of judgments, in force .at the time of requesting and executing the attachment involved herein, provided in § 10 that the attachment of personal property should be effected "by depositing the personal property in question with the court, or the person designated by it, *under the responsibility of the plaintiff.*" The present Rule 56.4 of the Rules of Civil Procedure contains the same provision.[3]

█ In Rule 56.1 were incorporated the general principles which were to govern the court in the consideration of the effectiveness procedure pursuant to the ruling in *National City Bank* v. *De la Torre*, 45 P.R.R. 609 (1933); *Carlo* v. *District Court*, 58 P.R.R. 889 (1941); and *Paz* v. *Bonet*, 31 P.R.R. 64 (1922): "The plaintiff should be given some security, but the defendant must not be oppressed or subjected to unnecessary difficulties in the conduct of his business." At present, effectiveness is granted at the discretion of the court. The court may decree the same by ordering the attachment, the receivership or "any other measure which it may deem advisable, according to the circumstances of the case," considering "the interests of all the parties."

█ In order to protect defendant against the damages resulting from the attachment, the Act of 1902 required the plaintiff to secure them by furnishing a bond "to secure the defendant against any damage caused to him by reason of the remedy."—Section 4—Rule 56.3 also requires it in a manner "sufficient to secure all the damages caused to the defendant."

In *Avilés* v. *Sons of Rafael Toro, Ltd.*, 27 P.R.R. 616, 622 (1919)—a case in which we awarded damages caused by an attachment without judgment having been rendered on the merits of the case—we held that the responsibility

---

[3] See obligations of bailee of things object of judicial deposit or sequestration imposed by §§ 1687 and 1688 of the Civil Code.

established by § 4 of the Act of 1902 fell on and affected not only the plaintiff in an action involving an attachment but also the sureties.

The bond contract signed by Campos del Toro, as principal obligated, did not condition his obligation or responsibility to the nonobtainment of judgment in his favor. In the pertinent part it reads:

"WHEREAS, in order to decree the attachment requested the Hon. Judge has required that a bond be given in the sum of Ten Thousand Dollars ($10,000) to answer for the damages which may be caused to defendant by such effectiveness;

"THEREFORE, we, the undersigned, to wit, (a) Rafael Campos, over 21 years of age, married to Rosaura Marqués, a businessman, resident of Arecibo, Puerto Rico, acting as principal in the present surety contract;

". . . . . . . .

"DO HEREBY bind ourselves jointly and solidarily in favor of defendant, and for the sum of Ten Thousand Dollars ($10,000), pursuant to the provisions of §§ 1, 6 and 16 of the Act *supra,* to answer up to such amount as may be covered, or part thereof which may be necessary, for payment of the damages which may be caused to defendant as a result of such effectiveness.

"In witness whereof, the said principal and sureties have executed this instrument on the — day of September 1952. (Sgd.) R. Campos, principal; (Sgd.) José Rodríguez Torrado, surety; and (Sgd.) Manuel Torrado Adrover, surety."

In *Berríos* v. *International General Electric,* 88 P.R.R. 106 (1963), we said among other things:

"It is well to indicate that the action to recover damages caused by an alleged wrongful attachment is an 'ex delicto' action based on § 1802 of the Civil Code (31 L.P.R.A. § 5141). *Méndez* v. *E. Solé & Co.,* 62 P.R.R. 805 (1944); *R. Muñiz de León & Co.* v. *Melón Hnos. & Cía.,* 56 P.R.R. 314 (1940). Said article provides insofar as pertinent: 'A person who by an act or omission causes damage to another when there is fault or negligence shall be obliged to repair the damage so done.' This

is the sanction of the Aquilian liability. On this principle we said in *Hernández* v. *Fournier*, 80 P.R.R. 94 (1957):

> " 'According to the section in question [§ 1802 of Civil Code], which establishes one of the fundamental principles of our jurisprudence—that of the Aquilian liability for personal acts—all damage, whether material or moral, gives rise to reparation if three requirements or elements are met: *first*, proof of the reality of the damage suffered; *second*, a causal relation between the damage and the action or omission of another person; and *third*, said act or omission is negligent or wrongful. 4 Castán, *Derecho Civil Español* (8th ed. 1956) 814 *et seq.*; Puig Peña, *Tratado de Derecho Civil Español*, Tome IV, Vol. 2 (1951) 537 *et seq.*; 2 Díaz Pairó, *Teoría General de las Obligaciones* (3d ed. 1954) 51 *et seq.*; Borrell, *Responsabilidades Derivadas de la Culpa Extracontractual Civil* (1942) 60–76, 157–77. That precept ". . . does not admit a limitation or exception of any kind; and consequently, the wrongdoer who is guilty of fault or negligence, whatever the consequences may be, is bound to repair the wrong, that the victim be delivered from the effects of the damage suffered." Borrell, *op. cit.*, 169. Thus, the manner how damage is caused is immaterial. And, by the same token, material as well as purely moral damages are recoverable in our jurisprudence.' (Citations.)
>
> "We are of the opinion that the facts of this case irrespective of whether or not the attachment was completed, give rise to the imposition of liability under the letter of § 1802. We have here a situation in which there have been unjustified acts on the part of the appellant showing carelessness or negligence, and furthermore, damages have been proved."

■ Even if the closing of a hotel or an apartment house could be ordered as a measure to secure the effectiveness of an attachment, appellants' argument loses all its persuasive or redeeming force where, as in this case, plaintiff himself opens the hotel to the public and all the floors of the building shortly after the attachment was levied and leases them to Payne together with all the chattels attached of the spouses, defendants therein, notwithstanding the fact that the term

of their previous lease still had one and one half years to run.

There should be no question that appellant herein, after having instituted his claim lawfully and likewise requested and obtained the decree of attachment of sufficient property to cover the sums claimed, abused and distorted the judicial proceeding in order to obtain unauthorized results, among them, to deprive his debtors completely of their property in order to collect his claim.

■ Considering as a whole the evidence presented and the facts which the trial court found proved, and that the petition for review is taken from the final judgment and not from the grounds thereof, the second and third assignments are frivolous.

■ The trial court had before it sufficient elements of judgment to conclude, as it did, that the marshal, at the request and under the direction of Campos del Toro . . . "ejected Alum and his guests, closed the premises, did not allow Serrano de Alum to go inside, and handed the key to Gumersindo Román." The ejectment from the place was so effective that shortly therafter Payne took possession of the leased floors and of all the chattels attached and operated the hotel under a new name. See the statement of Oscar Marengo Sotomayor, the marshal who executed the attachment, particularly pages 106 to 108, and that of Alum, pages 219 and 220.

■ In our opinion, the statements made by the trial judge in the following paragraphs constitute sufficient rebuttal of the fifth error as to the duty to reduce the damages:

"It is correct that plaintiffs should make reasonable efforts to reduce the damages suffered, but plaintiffs had no other income than that from the hotel business, and when it was attached they were practically left without means for their support. Under the circumstances appearing from the evidence as a whole, we do not believe that we ought to deprive plaintiffs

of their rights because of their failure to exercise due diligence.

"Plaintiffs' lack of diligence would have some importance if they had insisted on their third cause of action; however, it should not militate against their rights to collect the value of the chattels, nor should it affect the action of plaintiff Alum to recover the damages caused by the wrongful ejectment. After he was ejected from his dwelling, he could do nothing to limit the effects of the humiliation and annoyances caused to him and could not prevent the loss of the comforts of the home from which he was wrongfully ejected."

The sixth error relative to the weighing of the evidence is evidently frivolous. The seventh, which is submitted "on the argument of the other errors," is also frivolous.

The judgment appealed from will be affirmed in its entirety.